# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **JULIE A. SU**, | ) | |
| Acting Secretary of Labor, | ) | |
| United States Department of Labor, | ) | **CIVIL ACTION NO. 23-CV-513** |
| | ) | |
| Plaintiff, | ) | |
| | ) | District Judge |
| v. | ) | |
| | ) | |
| **UMR, INC.,** | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT</u>

**JULIE A. SU**, Acting Secretary of the United States Department of Labor (the "Secretary"), alleges:

1.      The Secretary is charged with enforcing the provisions of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*, which establishes, among other things, standards of conduct, responsibility, and obligations for fiduciaries of employee benefit plans.

2.      ERISA requires those who administer ERISA-covered plans act solely, exclusively, and prudently in the interests of plan participants. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

3.      This action is filed under ERISA, against UMR, Inc. ("UMR"), for UMR's violations of ERISA in connection with its administering of hospital emergency services claims ("ER Claims") and urinary drug screening claims ("UDS

Claims"), and the associated adverse benefit determinations denying emergency services and UDS Claims for thousands of participants.

4.     UMR's procedures for adjudicating claims arising out of services provided in hospital emergency rooms did not comply with the "prudent layperson" standard established under The Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 *et seq.* ("ACA"), which is incorporated in ERISA and the terms of the ERISA plans UMR administers.

5.     Specifically, UMR violated ERISA, including ERISA's prudence provisions and requirement to follow plan documents under ERISA § 404, 29 U.S.C. § 1104, by denying ER Claims based solely on diagnosis codes and not applying a prudent layperson standard. UMR's explanation of benefits for denied emergency services claims also failed to comply with the requirements of the ACA and the U.S. Department of Labor's ("Department's") claims procedures regulation at 29 C.F.R § 2560.503-1.

6.     UMR's procedures for adjudicating UDS claims resulted in it denying all UDS Claims, in violation of plan documents and ERISA's prudence provisions under ERISA § 404, 29 U.S.C. § 1104. UMR was required to apply a standard of "medical necessity" to determine whether a UDS claim was medically necessary. Specifically, UMR violated ERISA by denying UDS Claims because it applied no standard and simply denied all claims. For a limited time from August 26, 2018, to present, UMR did allow some UDS Claims to be paid if the drug screening was done in an emergency setting. Starting on October 11, 2019, UMR changed its practice

again by switching the denial code for UDS Claims from 914 (lack of medical necessity) to 515 (a denial requesting more medical records from the provider). UMR's explanation of benefits for denied UDS Claims also failed to comply with the requirements of the ACA and the Department's claims procedures regulation at 29 C.F.R § 2560.503-1.

7.     When ERISA's strict fiduciary standards are not met, the Secretary has the authority to seek relief under ERISA §§ 409 and 502(a)(2) and (5), 29 U.S.C. §§ 1109 and 1132(a)(2) and (5), to obtain other remedial and equitable relief. The Secretary may also seek to enjoin a breaching fiduciary from acting as a fiduciary or service provider to employee benefit plans in the future or for the fiduciary to reform its practices to comply with ERISA.

## JURISDICTION AND VENUE

8.     This action arises under Title I of ERISA and is brought by the Secretary under ERISA § 502(a)(2) and (5), 29 U.S.C. § 1132(a)(2) and (5), to enjoin acts and practices that violate the provisions of Title I of ERISA, to obtain appropriate remedial and equitable relief for breaches of fiduciary duty under ERISA § 409, 29 U.S.C. § 1109, and to obtain such further equitable relief as may be appropriate to redress violations and to enforce the provisions of Title I of ERISA.

9.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

10.     Venue is appropriate in the Western District of Wisconsin, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the breaches took place in this

3

district, UMR is headquartered in Wausau, Marathon County, Wisconsin, and UMR
provided the services at issue in this Complaint to at least 2,136 ERISA-covered
health plans from this location.

## PARTIES

11.    The Secretary is vested with the authority to enforce the provisions of
Title I of ERISA by, among other means, the filing and prosecution of civil claims
against fiduciaries and other parties who violate ERISA. ERISA § 502(a)(2) & (5),
29 U.S.C. § 1132(a)(2) & (5).

12.    UMR is a third-party administrator ("TPA") providing services to at
least 2,136 self-funded employee welfare benefit plans, as defined in ERISA § 3(1),
29 U.S.C. § 1002(1), that provide medical, surgical, or hospital care or benefits to
participating employees (the "Plans").

13.    UnitedHealth Group, Inc. ("UnitedHealth") is the parent company for
UMR. According to UnitedHealth, UMR is the nation's largest TPA.

14.    From at least January 1, 2015, to present, UMR provided, and
continues to provide, services to the Plans that includes the following: (1) network
access, management, and administration; (2) claim recovery services and
subrogation; (3) fraud and abuse management; (4) processing initial benefit
determinations; (5) processing first and second level internal appeals; (6)
determining whether claims would be paid; and (7) paying claims.

15.    The Plans contract directly with UMR.

16. The Plans' healthcare benefits are funded directly from the assets of the Plan or the employer; they are not funded through insurance policies.

17. The Plans entered into service agreements with UMR called Administrative Service Agreements ("ASAs").

18. In some of the ASAs, the Plans appointed UMR as:

> named fiduciary under the Plan with respect to (i) performing initial benefit determinations and payment, (ii) performing the fair and impartial review of first level internal appeals and (iii) performing the fair and impartial review of second level internal appeals (if applicable). As such, Customer delegates to UMR the discretionary authority to (i) construe and interpret the terms of the Plan, (ii) to determine the validity of charges submitted to UMR under the Plan, and (iii) make final, binding determinations concerning the availability of Plan benefits under the Plan's internal appeal process, all in compliance with federal law and regulation.

19. From January 1, 2015, to the present, for Plans with the appointment of UMR as described in paragraph 18 above, UMR was a named fiduciary with respect to those enumerated duties in the ASA.

20. In other ASAs, the Plans appointed UMR as a named fiduciary for the limited purpose of deciding adverse benefit determinations. Those ASAs state, "UMR is not and shall not be deemed to be a fiduciary with respect to the Plan, except to the extent that it is deciding an appeal of an Adverse Benefit Determination."

21. From January 1, 2015, to the present, UMR adjudicated claims, including ER Claims and UDS Claims. Adjudicating claims included processing

initial benefit determinations; processing first and second level internal appeals; and determining whether claims would be paid.

22.     As a result of the actions identified in paragraph 21 above from January 1, 2015, to the present, UMR exercised authority and control respecting management or disposition of the assets of the Plans, exercised discretionary authority or discretionary control over the management of the Plans, and/or had discretionary authority or discretionary responsibility in the administration of the Plans, and thus, is a fiduciary of the Plans pursuant to ERISA § 3(21)(A)(i) and (iii), 29 U.S.C. § 1002(21)(A)(i) and (iii), regardless of the specific language a given Plan's ASA uses to describe UMR.

23.     From January 1, 2015, to the present, UMR was a party in interest under ERISA § 3(14)(A) and (B), 29 U.S.C. § 1002(14)(A) and (B), because it was a fiduciary under ERISA as identified in paragraph 22 above, and because it provided services to the Plans, which are subject to ERISA.

<u>**COUNT ONE**</u>

**UMR improperly adjudicated ER Claims**

24.     Paragraphs 1-23 are incorporated by reference.

25.     UMR provides management and administration to the Plans by receiving, processing, and adjudicating healthcare claims for services provided by healthcare providers, including doctors, urgent care facilities, and hospitals.

26.     The plan documents for the Plans define "Emergency Services" and "Emergency Room" as covered benefits.

6

27.     The plan documents for the Plans have Exclusions sections, but Emergency Services and Emergency Rooms are not identified as exclusions, and there are no exclusions relating to ER Claims.

28.     The plan documents for the Plans directly incorporate and define a "prudent layperson standard" for the review of ER Claims.

29.     UMR receives, processes, and adjudicates ER Claims for Plans.

30.     Of the ERISA-covered, self-funded employee welfare benefit plans identified in paragraph 11 above, UMR utilized a "True Emergency" policy for approximately 371 of these Plans (the "Diagnosis Code List Plans") and adjudicated ER Claims by using one of two diagnosis code lists: True ER (T10 Coding) (the "T10 List") or Sudden and Severe (T11 Coding) (the "T11 List").

31.     UMR had exclusive control over the T10 and T11 Lists. The Diagnosis Code List Plans do not see the T10 or T11 List or have any role in the creation, additions, or deletions to codes on those lists. The Plans have no role in how UMR uses those lists when adjudicating ER Claims.

32.     UMR adjudicates ER Claims for most of the Diagnosis Code List Plans[1] by first comparing the diagnosis codes identified by the providers to the applicable T10 or T11 List.

33.     If an ER Claim is submitted and it does not have at least one diagnosis code that is on the applicable T10 or T11 List, UMR denies the claim. If at least one diagnosis code is on the list, UMR adjudicates the claim as payable. UMR considers

---

[1] A few Plans used a custom list instead of the True ER or Sudden and Severe list. Those Plans are not subject to this complaint as it relates to ER Claims.

no additional information and conducts no further analysis or review of the claim before the initial denial.

34.     When UMR denies a claim because it does not have at least one diagnosis code that is on the applicable T10 or T11 List, UMR sends the affected claimant an Explanation of Benefits ("EOB") that has very limited information.

35.     The EOBs simply include one of two denial codes: (1) "200 Charge(s) denied. The plan excludes benefits for this treatment. Refer to Covered Benefits and Exclusions in your Benefit Booklet," or (2) "947 Charge(s) denied. This service is excluded by your health plan. Refer to General Exclusions in your Benefit Booklet."

36.     The EOBs for denied ER Claims do not reference the specific plan provisions or specific rule on which the determination was based.

37.     The EOBs for denied ER Claims do not reference the prudent layperson standard, which is the standard or rule that applies under the plan documents for the review of ER Claims for the Plans.

38.     The EOBs for denied ER Claims do not indicate if the claim was denied due to a lack of proper documentation to demonstrate an emergency medical condition.

39.     The EOBs for denied ER Claims do not provide a description of additional information necessary for the claimant to perfect the claim or an explanation on why such material or information is necessary.

40.     When UMR denies an ER Claim, UMR permits claimants to make an informal appeal to challenge the denial by calling UMR and speaking to a customer

service representative. UMR does not inform participants of the informal appeal process.

41.     When UMR denies an ER Claim, UMR also permits claimants to file a written formal appeal to challenge the denial.

42.     Upon receiving an informal or formal appeal, UMR alone:

    a.  considers additional information from the participant or provider;

    b.  adjudicates the appeal; and

    c.  decides whether to grant or deny the appeal.

43.     At the time UMR initially adjudicated ER Claims based on the T10 and T11 Lists, UMR failed to consider what a person with average knowledge of health and medicine would think at the time the symptoms present themselves.

44.     UMR relied solely on a medical provider's diagnosis at the end of treatment to deny ER Claims.

45.     The ACA amended ERISA to make the market reform provisions of Title XXVII of the Public Health Service Act, 42 U.S.C. §§ 300gg *et seq.*, applicable to group health plans. ERISA § 715(a)(1), 29 U.S.C. § 1185d.

46.     Since at least 2011, the prudent layperson standard has been the required level of review for ERISA plans covering hospital emergency services. 42 U.S.C. § 300gg-19a(b)(2)(A) and (B). Section 2719A of the Public Health Service Act defines "emergency services" as certain services within the capability of a hospital

emergency department to evaluate and treat as an emergency medical condition. 42

U.S.C. § 300gg-19a(b)(2)(B).

47.     The definition of prudent layperson comes from the ACA's definition of

"emergency medical condition," which states:

> [A] medical condition manifesting itself by acute symptoms
> of sufficient severity (including severe pain) such that a
> *prudent layperson*, who possesses an average knowledge of
> health and medicine, could reasonably expect the absence
> of immediate medical attention to result in a condition . . .
>
>> (i) placing the health of the individual (or, with
>> respect to a pregnant woman, the health of the
>> woman or her unborn child) in serious jeopardy;
>> (ii) serious impairment to bodily functions; or
>> (iii) serious dysfunction of any bodily organ or part .
>> . . .

42 U.S.C. § 300gg-19a(b)(2)(A) (emphasis added) (citing 42 U.S.C. §

1395dd(e)(1)(A)(i)-(iii)).

48.     The claims procedures regulation requires, among other things, that

ERISA plans have reasonable claims procedures for the filing of claims, notification

of benefit determinations, and appeal of adverse benefit determinations. It also

prohibits unduly inhibiting or hampering the initiation or processing of claims. 29

C.F.R. § 2560.503-1(b) and (b)(3).

49.     The claims procedures regulation further requires that when

participants receive adverse benefit determinations, participants must be provided

with, among other things: the specific reasons for the adverse benefit

determination; the specific plan provisions on which the determination is based; a

description of any additional material or information necessary for the claimant to

perfect the claim; an explanation of why such material or information is necessary; and a description of the plan's review procedures and the time limits applicable to such procedures. 29 C.F.R. § 2560.503-1(g)(1).

50.     The claims procedures regulation also requires that adverse benefit determinations by a group health plan provide, if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request. 29 C.F.R. § 2560.503-1(g)(1)(v).

51.     By the conduct described in paragraphs 24 through 50 above, UMR:

a.     violated the prudence provisions of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

b.     violated the adherence to plan documents provisions of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

c.     failed to ensure the application of the prudent layperson standard for ER Claims adjudication, thereby failing to administer the Diagnosis Code List Plans in full compliance with ERISA § 715, 29 U.S.C. §1185d, incorporating Public Health Service Act § 2719A(b)(2)(A), 42 U.S.C. § 300gg-19a(b)(2)(A), and failed to establish and maintain reasonable claims

procedures in full compliance with the claims procedures regulation, 29 C.F.R. § 2560.503-1, as modified by 29 C.F.R. § 2590.715-2719(b);

      d.     failed to provide to participants and beneficiaries whose claims for benefits had been denied adequate notice in writing setting forth the specific reasons for such a denial and the appeal's process, thereby failing to administer the Diagnosis Code List Plans in full compliance with ERISA § 503, 29 U.S.C. § 1133, and the claims procedures regulation, 29 C.F.R. § 2560.503-1, as modified by 29 C.F.R. § 2590.715-2719(b).

## COUNT TWO

### UMR improperly adjudicated UDS Claims

52.    Paragraphs 1-23 are incorporated by reference.

53.    UMR receives, processes, and adjudicates UDS Claims for the Plans.

54.    The plan documents for the Plans identify the standard for approving UDS Claims as those that are "Medically Necessary."

55.    In the plan documents for the Plans, Medically Necessary/Medical Necessity means:

> [H]ealth care services provided for the purpose of preventing, evaluating, diagnosing, or treating an Illness, Injury, mental illness, substance use disorder, condition, or disease or its symptoms, that are all of the following as determined by us or our designee, within our sole discretion:
>
> •    In accordance with *Generally Accepted Standards of Medical Practice*; and
> •    Clinically appropriate, in terms of type, frequency, extent, site, and duration, and considered effective for Your

12

Illness, Injury, mental illness, substance use disorder, or disease or its symptoms; and
· Not mainly for Your convenience or that of Your doctor or other health care provider; and
· Not more costly than an alternative drug, service(s), or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of Your Illness, Injury, disease, or symptoms.

The fact that a Physician has performed, prescribed, recommended, ordered, or approved a service, treatment plan, supply, medicine, equipment, or facility, or that it is the only available procedure or treatment for a condition, does not, in itself, make the utilization of the service, treatment plan, supply, medicine, equipment, or facility Medically Necessary.

Generally Accepted Standards of Medical Practice are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.

If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. We reserve the right to consult expert opinion in determining whether health care services are Medically Necessary. The decision to apply Physician specialty society recommendations, the choice of expert, and the determination of when to use any such expert opinion will be within our sole discretion.

UnitedHealthcare Clinical Services develops and maintains clinical policies that describe the Generally Accepted Standards of medical Practice scientific evidence, prevailing medical standards, and clinical guidelines supporting our determinations regarding specific services. These clinical policies (as developed by UnitedHealthcare Clinical Services and revised from time to time), are available to Covered Persons by calling UMR at the

telephone number on the Plan ID card, and to Physicians and other health care professionals on UnitedHealthcareOnline.com.

56.     UMR did not apply a Medically Necessary/Medical Necessity standard to deny UDS Claims.

57.     From August 2015 to August 25, 2018, UMR simply denied all UDS Claims.

58.     From August 26, 2018, to present, UMR denied all UDS Claims that were not from either an emergency room or urgent care center.

59.     UMR made the change to its UDS-denial policy in August 2018 because UMR determined 98% of UDS Claims in an emergency room setting were overturned upon appeal.

60.     UMR did not follow any language in the plan documents or other direction from fiduciaries to permit UMR to deny all UDS Claims prior to August 2018, or all non-emergency UDS Claims after August 2018.

61.     From August 22, 2015, to October 11, 2019, only the following information was provided to participants regarding denied UDS Claims:

> Code 914: Charge(s) denied. Charges not considered medically necessary for coverage. See Exclusions and Glossary in your benefit booklet.

62.     After October 11, 2019, UMR's standard EOBs to deny UDS Claims stated:

> Code 515: Additional information needed to process your claim has been requested from your provider. The charge(s) on this claim are denied and will be reconsidered if the information is received in a timely manner. Follow up with

14

> your provider to ensure a prompt response to our request. Refer to Claims Procedure in your Benefit Booklet for additional information.

63.     The plan documents for the Plans contain an exclusion in the Exclusions sections for claims that are "Not Medically Necessary," and refers to the definition of Medically Necessary/Medical Necessity.

64.     In addition to the requirements identified in paragraphs 48 and 49 above, the claims procedure regulation also requires that adverse benefit determinations by a group health plan provide, if the adverse benefit determination is based on a medical necessity, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request. 29 C.F.R. § 2560.503-1(g)(1)(v).

65.     The EOBs for UDS Claim denials failed to provide the specific reason for adverse benefit determination, other than simply stating "not medically necessary."

66.     The EOBs for UDS Claim denials failed to reference to specific plan provisions on which the adverse benefit determination was based.

67.     The EOBs for UDS Claim denials failed to provide a description of additional materials or information necessary for claimant to perfect the claim.

68.     The EOBs for UDS Claim denials failed to provide an explanation of why such additional materials or information is necessary.

69.     The EOBs for UDS Claim denials failed to provide the internal rule, guideline, protocol, or similar criterion relied upon being identified.

70.     The EOBs for UDS Claim denials failed to provide a description of the Plan's standard used to deny the claim.

71.     For UDS Claims, because they were allegedly denied based on "medical necessity," UMR failed to provide an explanation of the scientific or clinical judgment for this determination that applies the terms of the plan or a statement that the explanation will be provided free of charge upon request.

72.     By the conduct described in paragraphs 52 through 71 above, UMR:

    a.      violated the prudence provisions of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

    b.      violated the adherence to plan documents provisions of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

    c.      failed to ensure the application of the Medical Necessity standard for UDS Claims adjudication, thereby failing to administer the Plans in full compliance with ERISA § 715, 29 U.S.C. §1185d, incorporating Public Health Service Act § 2719A(b)(2)(A), 42 U.S.C. § 300gg-19a(b)(2)(A), and failed to establish and maintain reasonable claims procedures in full compliance with the claims procedures regulation, 29 C.F.R. § 2560.503-1, as modified by 29 C.F.R. § 2590.715-2719(b); and

    d.      failed to provide adequate notice in writing to participants and beneficiaries whose claims for benefits had been denied setting forth the

16

specific reasons for such a denial and written in a manner calculated to be understood by the participants and beneficiaries, thereby failing to administer the Plans in full compliance with ERISA § 503, 29 U.S.C. § 1133, and the claims procedures regulation, 29 C.F.R. § 2560.503-1, as modified by 29 C.F.R. § 2590.715-2719(b).

## **PRAYER FOR RELIEF**

WHEREFORE, the Secretary requests this Court enter an Order, pursuant to ERISA §§ 409(a), 502(a)(2) and (5), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (5):

A.      Requiring UMR to reform its procedures for receiving, processing, and adjudicating ER Claims and UDS Claims to comply with ERISA;

B.      Requiring UMR to readjudicate all ER Claims and UDS Claims that were denied or partially denied from January 1, 2015, to present, in compliance with ERISA;

C.      Enjoining UMR from committing future violations of ERISA; and

D.     Granting such other relief as may be equitable, just, and proper.


Respectfully submitted,

**SEEMA NANDA**
Solicitor of Labor

**CHRISTINE Z. HERI**
Regional Solicitor

/s/ Kevin M. Wilemon
**KEVIN M. WILEMON**
Senior Trial Attorney

/s/Lydia J. Faklis
**LYDIA FAKLIS**
Trial Attorney

Attorneys for **JULIE A. SU**,
Acting Secretary of Labor, United States
Department of Labor, Plaintiff

P.O. ADDRESS:
U.S. Department of Labor
Office of the Solicitor
230 S. Dearborn St., Room 844
Chicago, IL 60604
T: (312) 353-6973
wilemon.kevin@dol.gov
faklis.lydia.j@dol.gov